IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 02, 2014 Session

## IN RE ROBERT C.

**Appeal from the Juvenile Court for Rutherford County**
**No. TC2023T      Donna Scott Davenport, Judge**

_____

**No. M2014-00702-COA-R3-PT – Filed February 3, 2015**

_____

This is a termination of parental rights case.  The trial court terminated Appellant/Father's parental rights on the grounds of: (1) abandonment; (2) substantial non-compliance with the permanency plan; and (3) persistence of conditions.  Because the grounds for termination of Father's parental rights are met by clear and convincing evidence, and there is also clear and convincing evidence that termination of Father's parental rights is in the best interest of the child, we affirm and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J. delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Brandon M. Booten, Murfreesboro, Tennessee, for the appellant, Delton C.

Robert Cooper, Jr. Attorney General and Reporter; and Rebekah A. Baker, Senior Counsel, for the appellee, State of Tennessee, Department of Children's Services.

Sally Schneider, Murfreesboro, Tennessee, Guardian *Ad Litem*.

### OPINION

### I.      Background

The child at issue in this case, Robert C.,[1] was born in February, 2012, to Shannon M., ("Mother"), and Delton C. ("Father" or "Appellant"). Mother surrendered her parental rights and is not a party to this appeal. At the time of his birth, Robert C. was drug-exposed and medically fragile. He was diagnosed with Hypoplastic Heart Syndrome and remained hospitalized for several weeks following delivery. He has required multiple surgeries as well as ongoing feeding, speech, and occupational therapies.

On March 23, 2012, the Tennessee Department of Children's Services ("DCS" or "Appellee") received a referral from the hospital. The referral was based on the fact that the parents' whereabouts were unknown, and hospital staff believed that they had left the state and abandoned the child. On April 4, 2012, DCS filed a dependency and neglect petition and requested an emergency protective custody order. A protective custody order was entered on April 4, 2012, finding Robert C. dependent and neglected pursuant to statute based on probable cause that Robert C.'s health and safety was in immediate danger and delay was likely to result in severe or irreparable harm. This finding was based on the abandonment of the drug-exposed medically fragile infant by the parents when they went to Florida without informing the hospital of their whereabouts and leaving no guardian for the child. Over the ensuing months, both the maternal and paternal grandmothers filed intervening petitions for custody, which were eventually denied. On August 27, 2013, DCS filed a petition to terminate Father's parental rights to Robert C. This petition to terminate parental rights was heard over two days in February 2014.

The evidence at trial reflects that the child has never lived with Father, and that Father has been incarcerated for most of the child's life. Specifically, Father was arrested and incarcerated from May 2012 to June 2012 for violation of probation; he was incarcerated again from October 2012 through December 2012 for another probation violation. Father's original charge of reckless aggravated assault occurred before the child's birth. In March 2013, Father was again incarcerated for the sale of a counterfeit controlled substance. He was still incarcerated at the time of the trial of this matter in February 2014. Father testified that he could be released as early as 90 days from the trial date; however, if he serves his full sentence, he will not be released until June 3, 2016.

Father testified that upon his release from prison, he plans to live with his aunt, and that he has a job opportunity. He further testified that he has stopped smoking, that he has no plans to violate his probation or be incarcerated again, that he is committed to learning about the child's medical needs, and that he will take Robert C. to all necessary medical appointments.

---

[1] In termination of parental rights cases, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

Despite the fact that Father had some seasonal employment when he was not incarcerated, the record shows that he has never provided any child support for Robert C. Likewise, the record reveals that Father has not made any effort to visit the child on any regular basis, even during those periods when he has not been incarcerated. In the twenty-two (22) months since the child came into DCS custody, Father has visited only a few times. Typically, supervised visitation was scheduled at the hospital or concurrent with the child's medical appointments in order for the father to become familiar with the child's medical needs. Although the operative permanency plan allotted Father a minimum of four hours of visitation per month, Father was incarcerated the majority of the time and was, therefore, unable to exercise even this minimal amount of visitation.

The child's foster mother, Tanasi O. (Ms. O.), a speech pathologist, first met Robert C. in May 2012 when he was just three months old. At that time, he was in the home of another foster family, and Ms. O. was visiting the home providing therapy to another child in the home. Although not specifically assigned to provide therapy to Robert C., Ms. O began sharing tips with Robert C.'s foster family to help with the child's feeding. Robert C. was eventually assigned to Ms. O's caseload. She and her husband developed a bond with the child and sought to become his foster parents with the ultimate hope of adopting him. Ms. O testified that since Robert C. came into their home in 2013, she and her husband have developed a parent-child relationship with him. She testified that she has been working with the child on his occupational, physical, and speech therapy needs, and he is thriving.

By order of March 10, 2014, the trial court terminated Father's parental rights on grounds of (1) abandonment; (2) substantial non-compliance with the permanency plan; and (3) persistence of conditions, and upon its finding that termination of Father's parental rights was in the child's best interest. Father appeals.

## II. Issues

Father raises only one issue for review as restated from his brief:

> Whether the trial court erred in determining that clear and convincing evidence exists such that termination of the Father's parental rights is in the best interest of the child?

Father has only raised the question of best interest, however, we cannot reach that issue without first determining whether at least one ground for termination is proved by clear and convincing evidence. Pursuant to section 36-1-113(c), "[t]ermination of parental or guardianship rights must be based upon: (1) A

finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) that termination of the parents or guardian's rights is in the best interest of the child." Although only one ground for termination of parental rights must be met, the Tennessee Supreme Court has directed this Court to review the findings of fact and conclusions of law as to each of the trial court's grounds for termination in order to avoid unnecessary remand. *See In re Angela E.,* 303 S.W.3d 240, 251 n. 14 (Tenn. 2010). Therefore, we will consider each of the grounds for termination before addressing whether the evidence clearly and convincingly supports the trial court's finding that termination of Father's parental rights is in the best interest of the child.

### III.    Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois,* 405 U.S. 645, 651 (1972); *Nash–Putnam v. McCloud,* 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash–Putnam,* 921 S.W.2d at 174–75 (citing *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L. Ed.2d 599 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.,* Nos. M2004–00999–COA–R3–PT, M2004–01572–COA–R3–PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36–1–113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn.Code Ann. § 36–1–113(c); *In re D.L.B.,* 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine,* 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky,* 455 U.S. at 769. Consequently, both the ground(s) for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36–3–113(c)(1); *In re Valentine,* 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable ... and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.,* 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* at 653.

4

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Furthermore, when the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id.; see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315–16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978); *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

## IV. Grounds for Termination of Father's Parental Rights

As noted earlier, the trial court relied on three of the statutory grounds in terminating Father's parental rights: (1) abandonment; (2) substantial noncompliance with the permanency plan; and (3) persistence of conditions. *See* Tenn.Code Ann. § 36–1–113(g)(1), (2), (3). We will review each of these grounds.

## A. Abandonment by Wanton Disregard

Tennessee Code Annotated Section 36-1-113(g)(1) provides that termination of parental rights may be based upon the ground of "[a]bandonment by the parent or guardian, as defined in § 36-1-102...." Tennessee Code Annotated Section 36-1-102(1)(A)(iv) defines abandonment, in relevant part, as follows:

> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has

5

willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, ***or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.***

*Id.* (emphasis added)*.*

The evidence, including Father's own testimony, indicates that, since the child's birth, there has not been a consecutive four-month period in which Father has not been incarcerated. Furthermore, Father was incarcerated for the entire four-month period prior to the filing of the petition to terminate parental rights. Moreover, he remained incarcerated for the six months that the petition was pending.

In finding the ground of abandonment by wanton disregard was met, the trial court focused on Father's continued criminal activity and repeated incarcerations after the birth of the child. The court concluded that Father's failure to stay out of prison exhibited a wanton disregard for Robert C. Specifically, the trial court found that Father had committed "one or two of the underlying criminal acts before Robert C. was born. Unfortunately, [Father] continued to exhibit criminal conduct causing him to lose his freedom and become incarcerated after Robert C.'s birth. Father remains incarcerated today. The court finds all of this to be significant."

This Court has held that "a parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." ***In re Audrey S***., 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). However, incarceration alone is not enough to demonstrate a lack of parental fitness; rather, it serves as a trigger mechanism allowing the court to look at the parent's pattern of conduct to determine if it renders the parent unfit or poses a substantial risk of harm to the child. ***Id***. This Court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." ***Id.*** at 867-868. In this case, all of these elements are present. Although Father's underlying aggravated assault conviction occurred before Robert C.'s birth, Father has continued to engage in criminal activities, which have violated his probation and resulted in additional incarceration. From our review, there is clear and convincing evidence in the record to support the trial court's finding that Father has abandoned this child by displaying wanton disregard for Robert C.'s well-being.

### B. Abandonment by Failure to Establish a Suitable Home and Lack of Concern

Tennessee Code Annotated Section 36-1-102(1)(A)(ii) further defines "abandonment" for purposes of termination of parental rights as follows:

> (ii) … for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, ***but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.***

*Id.* (emphasis added).

In this case, the trial court specifically found that Father "has failed to acquire and maintain residential stability," and that Father has demonstrated a "lack of concern" for his medically fragile newborn. As noted above, at the time of the hearing, Father was incarcerated. However, the record indicates that, even during those periods of time that Father was not incarcerated, he lived a transient lifestyle, moving between various motels.

There is nothing in the record to suggest that Father has ever maintained stable housing. As noted by the trial court, Father has failed to "provide a safe, nonsmoking appropriate home for the child." The trial court further found that Father has "failed to make reasonable efforts toward addressing . . . barriers that . . . necessitate the continued need for foster care." "Father has not removed those barriers and we still have . . . need for foster care today."

In addition to the housing issues that still persisted at the time of trial, the trial court also found that Father has displayed a lack of care or general concern for the child. "The court has seen no ability that [Father] can care for Robert C. . . . . he had nine or ten days while the child was hospitalized when he could have gone and demonstrated his ability to care for Robert C. The court has no proof of that. He didn't even visit." Although the trial court recognized that Father completed a 72-hour room-in with the child at the hospital, the court concluded that Father has failed to demonstrate that he has the ability to care for Robert C.'s special needs, and shows a general lack of concern for the child. The court further noted that there is no indication that Father has ever developed parenting skills by availing

7

himself of visitation and other parenting opportunities with the child. Particularly egregious to the trial court was the fact that Father failed to engage in anything other than token visitation with the child while he was in the hospital. The court noted that Father's failure in this regard demonstrated an inability "to care for Robert C. with or without special needs."

The trial court was also troubled by the fact that Father left the state while Robert C. was in the hospital. Father took a trip to Florida when the child was a medically fragile newborn. During his absence, the court had to appoint a medical agent for the child. The record shows that Robert C. was hospitalized again in June 2012 for seven days. Although Father was not incarcerated during this time, he did not visit the child during this subsequent hospitalization. The court specifically noted that although the doctors and nurses were present at the hospital, "[i]t is a parent's responsibility to be there and take care of their child. Therefore, I find that there was lack of concern at the onset of this for Robert C. and what was needed."

Amanda McKinney is the DCS caseworker who was assigned to Robert C. The trial court made a specific finding that Ms. McKinney's testimony was credible. During her testimony, Ms. McKinney reviewed fifty-five (55) notes in the file indicating each time she had attempted to contact Father to have him come in for a random drug test, or to set up visitation. At times Ms. McKinney testified that she would spend a week trying to reach Father on the telephone, however, the majority of her calls went unanswered and unreturned. When Ms. McKinney had the opportunity, at a scheduled visitation, to ask Father why he had failed to return her calls, he responded that "it was not his problem if he did not have minutes on his phone." At one point, Father failed to contact Ms. McKinney or DCS for a two month period. The trial court found that Ms. McKinney had gone above and beyond what was required in her attempt to contact and engage Father in the process, but that Father had not cooperated or availed himself of Ms. McKinney's efforts.

Ms. McKinney also testified regarding Father's failure to submit to twenty (20) random drug screens. As noted above, when Ms. McKinney would call and ask Father to come in for a drug screen, her calls would often go unanswered. Sometimes Father would not show up at the office. However, on one occasion, Father did come into the office for a drug screen, but he left the office before Ms. McKinney could meet him downstairs. Although Father did submit to approximately five drug screens, Ms. McKinney emphasized that most of these screens were not random because they were taken when Father knew he was coming to a Child and Family Team Meeting. In September 2012, Father tested positive for benzodiazepines. Although he provided a printout showing a prescription, he failed to provide his pill bottle for a pill count as required by the

8

permanency plan. The trial court found that "Ms. McKinney's testimony shows a lack of concern by [Father]."

As mentioned earlier, the evidence indicates that Father has never provided support for this child. Although there was no child support order in place for the benefit of Robert C., Tennessee Code Annotated Section 36–1–102(1)(H) provides that "every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." A parent's obligation to support his or her child exists regardless of a court order requiring the parent to pay support. *See, e.g., **In re Shandajha A.G.,*** No. E2012–02579–COA–R3–PT, 2013 WL 3787594 (Tenn. Ct. App. July 17, 2013) As discussed by this Court in ***State ex rel. Hayes v. Carter,*** No. W2005–02136–COA–R3–JV, 2006 WL 2002577 (Tenn. Ct. App. July 6, 2006):

> It is well settled in Tennessee that biological parents must, as a general matter, support their children until they reach the age of majority. *See* T.C.A. § 34–1–102(a), (b) (2001); ***Smith v. Gore,*** 728 S.W.2d 738, 750 (Tenn. 1987). Their support obligations are joint and several, and the extent of their obligations depends on their ability to provide support.... The parent's obligation to support, as well as the child's right to support, exist regardless of whether a court order exists, and regardless of whether the parents were ever married.

***State ex rel. Hayes v. Carter,*** 2006 WL 2002577 at *2.

The trial court held that Father's actions and choices "demonstrate a pattern of a continued failure to provide for Robert C.'s physical, psychological, mental, and emotional welfare." The trial court went on to state that it is

> not enough to love your child, you must demonstrate that love by caring for and providing for your child. . . .this court has to look at a demonstration of that love, that bond, that caring. . . .and the court does not believe that Father has demonstrated, prior to his [most recent] incarceration of March 20th, 2013, that he has done anything to care for Robert C.

Although the trial court acknowledged Father's plan to be released on parole and move in with his aunt, the trial court determined that it "must look at the prior actions of the parent; rather than his future aspirations of what he plans to do. Permanency is paramount in this Court for children." This Court has previously held that "in determining whether grounds for termination of the parental rights of

a biological parent are established, both the trial court and this Court must look to the evidence of the parent's past actions, rather than the parent's future aspirations." *In re Adoption of Logan A.S.*, 2010 WL 3984712, at *8 (Tenn. Ct. App. Oct. 12, 2010). Based on the totality of the circumstances, we conclude that there is clear and convincing evidence in the record to support the trial court's finding that Father has demonstrated a lack of concern for the child's welfare.

### C. Substantial Non-compliance with the Permanency Plan

Father's parental rights were also terminated on the ground of failure to substantially comply with his responsibilities as set out in the permanency plans pursuant to Tennessee Code Annotated section 36–1–113(g)(2). As discussed by this Court in *In re M.J.B.,* 140 S.W.3d 643 (Tenn. Ct. App. 2004):

> Terminating parental rights based on Tenn.Code Ann. § 36–1–113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn.Code Ann. § 36–1–113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine,* 79 S.W.3d at 547; *In re L.J.C.,* 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met**.** *In re Valentine,* 79 S.W.3d at 548–49; *In re Z.J.S.,* 2003 WL 21266854, at *12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine,* 79 S.W.3d at 548; *Department of Children's Servs. v. C.L.,* No. M2001–02729–COA–R3–JV, 2003 WL 22037399, at *18 (Tenn.Ct.App. Aug. 29, 2003) (No Tenn. R.App. P. 11 application filed).

*Id*. at 656–57.

The trial court ratified multiple permanency plans for the child and found that the goals of each plan were reasonably related to correcting the issues that necessitated the child's placement in foster care, namely Father's abandonment of the child, drug problems, lack of steady income, and lack of stable housing. The initial plan had a goal of reunification and required Father to complete the following tasks: (1) participate in a clinical assessment with alcohol and drug and anger components by May 31, 2012; (2) attend weekly alcoholics anonymous

10

(AA)/ narcotics anonymous (NA) meetings; (3) provide DCS with a lease or letter from a landlord, along with a written budget demonstrating his ability to care for the child; (4) provide DCS with proof of a legal means of income; (5) participate in the transparenting class at the Exchange Club and free classes at the Exchange Club to learn parenting skills; (6) cooperate with DCS, guardian *ad litem* (GAL), court appointed special advocate (CASA), and his attorney and not incur any new legal charges; (7) make efforts to attend all of the child's medical appointments and provide documentation for missed appointments, while maintaining contact with DCS; (8) notify his doctors of his history with substance abuse and request non-narcotic medication; and (9) attend visitations sober, and submit to random drug screens (urine within 3 hours and hair follicle within 72 hours of request). Father participated in the formulation of this plan, and it was ratified by the trial court on May 18, 2012.

A revised permanency plan was developed on October 31, 2012. This plan listed two goals: reunification and exit custody with a relative. The revised plan required Father to complete the following actions: (1) participate in random drug screens; (2) complete clinical assessment with alcohol and drug and anger management components by May 31, 2012; (3) ensure prescriptions are available with pill counts at all visits, DCS office visits, or court appearances; (4) notify physicians of history with substance abuse and request non-narcotic medications; (5) follow all recommendations of the clinical assessments by October 20, 2012; (6) sign a release of information so DCS can access Father's medical records; (7) participate in couple's counseling; (8) attend visitations sober and pass random drug screens before visitations; (9) attend weekly AA/NA meetings; and (10) complete intensive outpatient drug treatment.

Other listed action items required Father to: (1) cooperate with DCS, GAL, CASA and attorneys; resolve current legal issues and not incurring new charges; (2) not allow cigarette smoke around the child; (3) provide DCS with a lease or letter from a landlord and a written budget; (4) consistently demonstrate the ability to competently care for Robert C.; (5) provide DCS with a legal means of income; (6) participate in transparenting classes at the Exchange Club to learn parenting skills; (8) attend all doctor appointments and provide documentation for missed appointments, while maintaining current contact with DCS. Goals to care for Robert C.'s medical needs were listed as follows: (1) attend medical training according to Vanderbilt and medical provider standards to care for the child's needs; (2) maintain residential stability and space for the child; (3) develop a parenting plan that will include childcare and transportation; (4) participate in a home study to ensure there is an appropriate home for the child; (5) identify individuals who can be medically trained to care for the child and who will submit to background checks; and (6) not smoke near or around the child and protect him from smoke exposure. Although he received notice, Father did not participate in

the formation of this plan because he was incarcerated at the time. This second plan was ratified by the trial court on December 7, 2012.

The permanency plan was revised for a third time on June 6, 2013. This plan added a third goal of adoption. Father's requirements remained the same as set out in the previous plan, with the addition of the language "smokers will take precautions recommended by Vanderbilt." Although Father did not participate in the formation of the third plan, he did review the plan and disputed the goal of adoption. However, Father never filed an objection to any of the permanency plans. The third permanency plan was ratified by the trial court on August 16, 2013. Despite the fact that he reviewed all of the permanency plans, and never filed an objection to any of them, the record shows that Father has repeatedly failed to comply with his plan requirements.

We have already discussed Father's failure to provide suitable housing, and his failure to appear for at least twenty (20) random drug screens. Additionally, Father did not comply with the requirement to resolve all current legal issues and charges, while not incurring any new ones. As discussed in detail above, at the time of trial, Father had been incarcerated since March 2013. Father also failed to provide current contact information to DCS, CASA, and to the guardian *ad litem*. In fact, for a two-month period, Father made no contact whatsoever with DCS.

Father did not participate in intensive outpatient therapy, did not attend anger management classes, and never provided his pills for pill counts. Father did not provide proof of participation in the transparenting class. Father did not participate in alcohol and drug services through a treatment provider, nor did he continue his attendance at AA/NA meetings after September 18, 2012. Likewise, Father never provided documentation of a steady job and did not provide a transportation plan, child care plan, or budget form to DCS.

In fact, the record indicates that Father only completed one task, i.e. taking an assessment. However, even that task was not completed in a timely manner. The plan required Father to complete the assessment by the end of May 2012. Father did not take the assessment until August 2012. Although he submitted to the assessment, there is no evidence that Father followed any of the recommendations. Although Father did attend some AA/NA classes, he never attended any such classes after September 18, 2012. From the totality of the circumstances, we conclude that there is clear and convincing evidence to support termination of Father's parental rights on the ground of substantial non-compliance with the requirements of the permanency plans.

**D. Reasonable Efforts**

12

Historically, the decision to pursue a termination of parental rights on the grounds of abandonment and/or substantial noncompliance with a permanency plan has invoked DCS's statutory duty to make reasonable efforts to facilitate the safe return of children to the parent's home. *In re R.L.F.*, 278 S.W.3d 305, 315 (Tenn. Ct. App. 2008) (citing Tenn. Code Ann. § 37-1-166(b), -166(a)(2), -166(g)(2)); see also *In re Tiffany B.*, 228 S.W.3d 148, 151, 160 (Tenn. Ct. App. 2007) (vacating a finding of abandonment, substantial noncompliance, and persistence of conditions for failure to make reasonable efforts). However, while this case has been pending in this Court, our Tennessee Supreme Court has issued an opinion in *In re Kaliyah S.*, -- S.W.3d --, No. E2013-01352-SC-R11-PT, 2015 WL 273659 (Tenn. 2015). *Kaliyah* specifically overrules "the holding of *In re Tiffany B.* and other cases following the holding in *In re C.M.M.* to the extent that the court required DCS to prove by clear and convincing evidence that it made reasonable efforts to reunify as a precondition to termination of parental rights. (citations omitted)." *In re Kaliyah S.* at *18 n.34. Proof of reasonable efforts is specifically required by statute to prove the ground of abandonment by failure to provide a suitable home. However, even under that ground for termination, DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal." *Id.* at *18 n.32 (citing Tenn. Code. Ann. §36-1-102(1)(A)(ii)). Our supreme court stated:

> proof of reasonable efforts is not a precondition to termination of parental rights of a respondent parent. As with other factual findings made in connection with the best interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. *In re Audrey S.*, 182 S.W.3d at 861. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that the termination is in the child's best interest (citations omitted).

*Id.* at *18.

In the instant case, the trial court found that DCS made reasonable efforts toward reunification. The record indicates that upon receiving custody of the child, DCS immediately met with Father to address his criminal issues and prescription drug abuse. DCS made reasonable efforts to find a family member to care for the child. Specifically, Robert C.'s first case worker, Dana Ebstein, testified that she researched nine possible placements for Robert C. but "these nine family members were either not able to provide for Robert C.'s special medical needs; or they opted out of caring for Robert C; or they could not pass the criteria for the

Department to place with them, because of criminal history in the family." The trial court found that DCS made reasonable efforts to find a less drastic alternative to state custody by researching these nine potential family members and encouraging Father's mother to file a petition for custody.

The trial court also found that DCS made numerous attempts to maintain contact with Father despite Father's failure to keep DCS informed of his whereabouts. Specifically, the court found that the

> State assisted the best it could with [Father's] absences and with his no-contact information. . . . [Father] said he changed his address. . . . So it was [Father's] responsibility to update the Department, the clerk and everybody else involved in this case [as to] where people could get in touch with him, where they could call him, where they could reach him, physically, and where he could receive mail.

From the totality of the circumstances, we conclude that there is a preponderance of the evidence that DCS made reasonable efforts to find a suitable home for Robert C.

### E.  Persistence of Conditions

Tennessee Code Annotated Section 36–1–113(g)(3) provides that termination of parental rights may be based upon persistence of conditions:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal *or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect* and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

14

*Id*. (emphasis added); See also *In re S.Y.*, 121 S.W.3d 358, 369 (Tenn. Ct. App. 2003).

In the case of *In re Audrey S.,* 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court held that, based upon the statutory text and its historical development, the ground of persistence of conditions found in Tennessee Code Annotated Section 36–1–113(g)(3) provides a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse. *Id.* at 872. On April 4, 2012, DCS filed a Petition to find Robert C. dependent and neglected. Finding Robert C. dependent and neglected pursuant to statute, the trial court entered a protective custody order on April 4, 2012. The order was based on probable cause that Robert C.'s health and safety was in immediate danger and delay was likely to result in severe or irreparable harm. The trial court found that Father had abandoned Robert C. when he went to Florida without informing the hospital of his whereabouts and leaving no guardian for the child. The order goes on to state that although Father submitted to a drug screen which was negative, he also stated that he had prescriptions for Xanax and Hydrocodone, but was unable to produce any evidence of these prescriptions.

The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H*., 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010). In its order terminating Father's parental rights, the trial court cited Tennessee Code Annotated section 36-1-113(g)(3), noting that the child has been in state custody almost two years, that Father is incarcerated, that there is no evidence that he can provide for the needs of Robert C. During the pendency of this case, there has not been a consecutive four month period in which Father has not been incarcerated. There is no evidence that Father has ever been able to provide a stable and suitable home for Robert C. Rather than avail himself of DCS's efforts to help him gain custody of the child, Father has continued to engage in a pattern of wanton disregard. Abandonment and drug exposure were the reasons the child came into state custody. Father has continued to engage in drug activity and other criminal behavior which has resulted in numerous incarcerations that have resulted in Father's continued abandonment of this child. Accordingly, we conclude that there is clear and convincing evidence that conditions persist making it unsafe for this child to be returned to Father in the near future.

## V. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination

of the parent's rights is in the child's best interest. ***White v. Moody,*** 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit upon establishment of a ground for termination of parental rights, then "the interests of parent and child diverge." ***In re Audrey S.,*** 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id.* Because not all parental conduct is irredeemable, "Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *Id.* However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). "The child's best interest must be viewed from the child's, rather than the parent's, perspective." ***White,*** 171 S.W.3d 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child. These factors include, but are not limited to:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> * * *
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36–5–101.

Tenn.Code Ann. § 36–1–113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.,* 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.,* 182 S.W.3d at 877.

In its order, the trial court made several findings concerning Robert C.'s best interest. With regard to the first factor, i.e., whether the parent has made an adjustment of conditions to make it safe and in the child's best interest to be in the parent's home, the trial court found that Father "has no home. [Father's] home is in prison. He's constantly been in and out of jail since the case began two years ago. Now he is in prison." The evidence clearly and convincingly supports this finding. Accordingly, factor one weighs in favor of termination of Father's parental rights.

Concerning the second factor, i.e., "whether the parent has failed to effect a lasting adjustment after reasonable efforts by social services agencies for such duration of time that lasting adjustment does not reasonably appear possible," the trial court found that Father

> has made no adjustment. . . .he continued to commit crimes knowing his baby needed him. . . it's [Father's] responsibility to step up. You've got to show up to play; and [Father] hasn't done that. The court has no proof that he's made any change or an adjustment; and the Department has made those reasonable efforts. If [Father] had just not continued to violate and be thrown back in jail, the court believes [Father] could have made it. Unfortunately, he did not.

We have discussed previously in this opinion Father's failure to adjust his circumstances even though DCS has made reasonable effort to assist him. From the totality of the circumstances, this factor also weighs in favor of termination.

With regard to the third factor, whether the parent has maintained regular visitation or other contact with the child, the trial court found that

> Father did not maintain regular visitation. There were nine or ten days he could have visited with Robert in the beginning, bonded with that baby at the beginning…. Instead [Father] decides to run off to Florida and then he disappeared another time and he does not visit. [Father] does not submit for drug screens knowing that is a barrier to visitation; just show up and take the screen. . . . Then [Father] would have had more time with Robert. . . . but he did not take every opportunity to try to bond.

Because there was no regular visitation, the trial court also found that there was not a meaningful relationship between the Father and the child under the fourth statutory factor. The trial court specifically stated: "the court is sorry that it cannot find that there is a father/child relationship between Robert C. and [Father]. Robert C. does not know [Father]. There is no relationship that is meaningful as a parent and child." From our review of the record, there is clear and convincing evidence that Father has failed to maintain regular visitation and that no bond exists between Robert C. and Father. Accordingly factors three and four weigh in favor of termination of Father's parental rights.

The trial court also found that a change in caretakers would be "devastating for Robert C. emotionally, physically, and medically." The trial court found that Robert C. has a parent/child relationship with his foster family, and the foster family wants to adopt him. Robert C. is "thriving in this home due to the care being provided by this specific resource family." From the record, and particularly in light of Ms. O's testimony, it is clear that Robert C. continues to need medical attention and stability. Father has no stability. Accordingly, we agree with the trial court that removal from the current foster placement would likely cause Robert C. harm. He has found a stable loving home with Mr. and Mrs. O. and it is in his best interest to remain in that environment where he has every chance to thrive.

The remaining relevant statutory factors also weigh in favor of termination of Father's parental rights. As previously discussed Father has no stable housing. He has failed to provide support for the child, and, as the trial court found, "he has done nothing to be a parent in two years." From the totality of the circumstances, we conclude that there is clear and convincing evidence in the record to support the trial court's finding that termination of Father's parental rights is in this child's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the order of the trial court, terminating Father's parental rights. The case is remanded to the trial court for such further

proceedings as may be necessary and are consistent with this opinion.  Costs of the appeal are assessed against Father, Delton C.  Because Father is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
JUDGE KENNY ARMSTRONG